UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| BRAD OSTER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC.,<br><br>Defendants. | ) | Civil Action No. 3:26-cv-842<br>Related Action: *In Re: CoStar Group, Inc. et al., Antitrust Litigation*, Case No. 3:26md3192 (DJN) |

**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff Brad Oster ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively, "CoStar" or "Defendants") for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and alleges as follows, based on personal knowledge as to Plaintiff's own acts and experiences, and on information and belief as to all other matters, including the investigation of counsel:

## I. INTRODUCTION

1. Defendants CoStar Group, Inc. and CoStar Realty Information, Inc. are the dominant providers of Internet commercial real estate ("CRE") listing and information services in the United States, operating through the CoStar Platform (CRE information services) and LoopNet (CRE listing services). CoStar and LoopNet together account for the overwhelming

majority of CRE listing and information activity in the United States. By CoStar's own admission, nearly 90% of all CRE activity occurs on a CoStar Network, and CoStar's CRE listing and information services platforms yield more than $1 billion in annual revenue.

2. CoStar did not achieve this dominance through superior products or competitive pricing. It achieved dominance by eliminating competitors through acquisition and litigation, and then by deploying a self-reinforcing anticompetitive scheme designed to prevent any new competitor from challenging its position.

3. CoStar's own former employees have described the consequences of that dominance for CoStar's customers. As one former CoStar employee recounted: "There is only one customer at CoStar Group — [CEO Andrew Florance]. Nobody really cares about the actual customers. As one manager said to me, 'they have nowhere else to go!'" Another described the company's indifference to customer complaints: "Management doesn't care. As long as there is no competition, they will always be able to sell. They know no one is in competition with their product, so they do not care."

4. CoStar's scheme has several components: including (a) the deliberate watermarking and "fingerprinting" of customer-submitted content to assert false ownership over it and to detect and punish customers who share that content with rival platforms; and (b) technological barriers — including IP-address blocking and firewalls — that prevent competitors and brokers from accessing publicly available listing data, even where the broker who owns that data has authorized a competitor to use it. CoStar enforces this scheme through contractual penalties, threatening communications from outside counsel, litigation and threats of litigation,

scraping of competitors' websites, and the imposition of technological image "filters" on competitors.

5. The value of CoStar's platforms lies in its customers' own data, because the vast majority of the photographs and data on CoStar's platforms (and that it claims as its own) is submitted by its customers. By cornering the supply of customer-submitted CRE information, CoStar denies would-be competitors the essential inputs they need to build a rival platform, ensuring that no competitor can grow large enough to impose price discipline on CoStar.

6. As a direct result of this scheme, Plaintiff and members of the Class defined below have paid, and continue to pay, supracompetitive prices for CRE listing and information services that they would not have paid in a competitive market.

7. Plaintiff brings this action on behalf of himself and a proposed nationwide Class of similarly situated CoStar and LoopNet customers under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, to recover treble damages and to obtain injunctive relief halting Defendants' ongoing anticompetitive conduct.

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and under Section 4 of the Clayton Act, 15 U.S.C. § 15, and Section 16 of the Clayton Act, 15 U.S.C. § 26, because this action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a state different from that of Defendants.

9. This Court has personal jurisdiction over Defendants because Defendants are headquartered in this District, regularly transact business in this District, and have committed, in substantial part, the acts alleged herein in this District.

10. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c), because Defendants reside in, are found in, and transact business in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

11. Defendants' conduct, as alleged herein, has substantially affected interstate trade and commerce. Defendants provide CRE listing and information services, and sell CRE data, photographs, and analytics, to customers located throughout the United States, and their anticompetitive conduct has caused increased prices, reduced choice, and reduced innovation on a nationwide basis.

## III. PARTIES

12. Plaintiff Brad Oster is an individual residing in the New Orleans, Louisiana metropolitan area. Since at least September 2024 and continuing to the present, Plaintiff has paid CoStar Realty Information, Inc., doing business as LoopNet, for a "Premium Listing Plan" and related CRE listing services, at a cost ranging from approximately $178.00 to $356.00 per month.

13. Defendant CoStar Group, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1201 Wilson Blvd., Arlington, Virginia 22209.

14. Defendant CoStar Realty Information, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1201 Wilson Blvd., Arlington, Virginia 22209. CoStar Realty Information, Inc. is a wholly owned subsidiary of CoStar Group, Inc. In 2017, CoStar Group merged its subsidiary LoopNet, Inc. into CoStar Realty Information, Inc., which presently operates the LoopNet-branded CRE listing service under which Plaintiff was charged the fees described in Paragraph 12.

15. Unless otherwise noted, Defendants CoStar Group, Inc. and CoStar Realty Information, Inc. are referred to collectively herein as “CoStar” or “Defendants,” consistent with Defendants’ own public description of themselves as a single, integrated enterprise operating the CoStar Platform and LoopNet brands.

16. At all relevant times, CoStar Group and CoStar Realty Information, Inc. operated not as separate and independent corporate entities, but as integrated components of a single enterprise under the centralized control and direction of CoStar Group. CoStar Group maintains a single, centralized executive leadership team that exercises authority over all subsidiaries; CoStar Realty Information, Inc. is not publicly traded, does not issue separate public financial statements, and its revenues, expenses, operations, and liabilities are fully consolidated into CoStar Group’s SEC filings. CoStar Group’s official website identifies LoopNet as an internal “brand” or “product” of CoStar Group, and Defendants’ public communications repeatedly use collective terms such as “we,” “our company,” and “CoStar Group” when describing operations carried out by LoopNet and CoStar Realty Information, Inc.

17. CoStar Group likewise maintains a single, centralized workforce that performs services across the LoopNet and CoStar Platform product lines without regard to corporate

boundaries. Specifically, positions dedicated to LoopNet operations — including sales, digital advertising, and marketplace management roles — are posted, recruited, and hired through CoStar Group's centralized careers portal, identify CoStar Group as the employer, and are subject to CoStar Group's policies and benefits plans.

## IV. FACTUAL ALLEGATIONS

### *A. The CRE Listing and Information Services Markets*

18. Commercial real estate brokers, owners, and other CRE professionals rely on two related but distinct categories of digital platforms: (a) CRE information services, which compile detailed data on commercial properties, including addresses, asking prices, lease rates, historical transactions, and photographs; and (b) CRE listing services, which maintain searchable platforms on which brokers and owners market properties currently or previously available for sale or lease.

19. Both categories of service exhibit strong network effects: the more customers who submit listings and data to a platform, the more valuable that platform becomes to those searching for CRE opportunities, and the more searchers a platform attracts, the more customers are drawn to list on it. These network effects create substantial barriers to entry for any new or nascent competitor, because a new entrant cannot attract customers without data, and cannot obtain data without customers.

20. The Federal Trade Commission ("FTC") has recognized these market realities since at least 2012, when it reviewed CoStar's acquisition of LoopNet. The FTC observed that "CRE listings databases provide two-sided online catalogues of CRE availabilities, allowing users simultaneously to publish and to search for CRE space available for sale and for lease,"

and that "CRE information services provide CRE industry participants with the in-depth information about specific properties necessary for accurate evaluation of potential transactions." The FTC further found that "[s]ignificant network effects characterize the market for CRE listings databases and create a substantial barrier to new entry," and that "[f]or both listings databases and information services, entry and expansion are difficult, costly, and time-consuming."

21. An Internet CRE information services platform that cannot access CRE listing information cannot compete, because customer-submitted listing information supplies the essential data inputs from which CRE analytics are generated. Providers of CRE information services can, in theory, obtain data by scouring fragmented public sources (such as county recorders and assessors), by crowdsourcing data from users, by purchasing data from general-purpose data providers, or — where the provider also operates a CRE listing platform — by mining its own listing platform for customer-submitted data. But aggregating data from fragmented public sources is substantially more time-consuming, costly, and incomplete than obtaining broker-submitted listing data, and no alternative source replicates the breadth, freshness, and detail of the listing content that brokers themselves submit.

22. CoStar operates the dominant platform in each category: the CoStar Platform for CRE information services, and LoopNet for CRE listing services, and the substantial majority of the photographs and data on its platforms is customer-submitted.

23. LoopNet permits members of the general public to search and view certain CRE listings for free, but advertising CRE listings on LoopNet requires a paid subscription. LoopNet charges a fixed dollar amount per listing, per month, under four-tiered advertising packages —

Silver, Gold, Platinum, and Diamond — that range from hundreds to thousands of dollars per listing, per month, with higher-priced tiers purchasing greater visibility and search placement. LoopNet subscriptions carry initial terms and automatically renew unless the customer submits written notice of non-renewal in advance.[1]

24. Access to the CoStar Platform requires a paid subscription that, on information and belief, costs between approximately $300 and $1,000 per user, per month. CoStar requires brokerage customers to purchase subscriptions for all of the brokerage's brokers and agents, whether or not each broker or agent will actually use the service. CoStar Platform subscriptions carry minimum one-year terms and renew automatically absent written notice of cancellation at least 60 days before the end of the term.

25. CoStar also cultivates broker dependence on its platforms through a software tool called LoopLink, which integrates with a broker's own website to display the broker's CRE listings as they appear on LoopNet. LoopLink and LoopNet are synchronized: an update to a listing in either location is automatically reflected in the other. Because of LoopNet's near universality, many brokers — including some of the largest brokerage firms in the country — rely on LoopLink not only to advertise their listings but as the sole repository of their own CRE listing information and often do not maintain their listing data anywhere outside their LoopLink-hosted websites.

---

[1] For example, standard "Listing Plans" . . . "will automatically renew for successive periods equal to the initial term, unless at least 60 days prior to the last day of the initial term or renewal term, as applicable, either party has provided to the other written notice of nonrenewal." LoopNet Advertising Agreement Terms and Conditions § 4(b) (eff. Feb. 6, 2025), https://www.loopnet.com/solutions/LoopNetTerms-and-Conditions. "Signature Listings" (Gold/Platinum/Diamond) carry a 6-month initial term and thereafter renew month-to-month on 14 days' notice, id. § 4(c).

26. In late 2017, CoStar synchronized its CRE information platform with LoopNet, establishing a continuous data feed from LoopNet to the CoStar Platform. When a broker submits CRE photographs and listing information to LoopNet, that content is automatically fed into the CoStar Platform. LoopNet's dominance in CRE listing services thereby reinforces the CoStar Platform's dominance in CRE information services.

***B. CoStar's Rise to Dominance***

27. CoStar was founded in 1987. Since the 1990s, it has completed more than 30 acquisitions of competing or complementary businesses, systematically eliminating sources of competition in the CRE listing and information services markets. CoStar's acquisitions include Apartments.com (2014, approximately $585 million), Apartment Finder (2015, approximately $170 million), Ten-X (2020, approximately $190 million), Homes.com (2021, approximately $156 million), and Matterport (2025, approximately $1.6 billion).

28. LoopNet was founded in the mid-1990s as an independent company and was the first CRE data company to crowdsource listing information from brokers, offering brokers a free, publicly visible online platform on which to market their listings. Over time LoopNet became the primary destination for publicly marketed CRE listings and the de facto system of record for many brokerages, which abandoned internal systems in favor of LoopNet and its LoopLink website tool.

29. For more than a decade, CoStar and LoopNet were in near constant litigation. CoStar sued LoopNet in 1999, contending that LoopNet was liable for accepting broker-submitted listing photographs that CoStar claimed as its own. LoopNet, in turn, sued CoStar in 2005 and again in 2007, alleging that CoStar copied listing information from LoopNet's website

and from brokers' LoopLink-hosted websites for competitive purposes, and that CoStar copied listings from the LoopNet servers that incorporate photographs taken by or on behalf of the listing broker and applied a CoStar watermark to such photographs.

30. In sworn declarations submitted in that litigation in 2008 and 2009, CoStar's founder and CEO Andrew Florance admitted that CoStar had accessed information on the non-password protected areas of LoopNet's website and used that information for competitive purposes, and asserted that CoStar had the right to update its database from broker websites or from listings on the LoopNet website to which brokers had directed CoStar by email.

31. When LoopNet blocked CoStar's IP addresses from accessing publicly available listings in February 2009 — including on brokers' own LoopLink-enabled websites — CoStar deployed technological countermeasures, using different Internet addresses to circumvent LoopNet's blocks.

32. In short, acquiring photographs and listing data from brokers' LoopLink-powered websites — the very conduct that CoStar now condemns when undertaken by its competitors — is precisely how CoStar itself built its database. Unable to overcome LoopNet's blocking tactics, CoStar chose instead to absorb LoopNet and to deploy the same exclusionary playbook, on a far larger scale, against its own competitors.

33. In 2012, CoStar acquired LoopNet, then CoStar's principal remaining competitor in both CRE information services and CRE listing services, for approximately $860 million. At the time of the acquisition, LoopNet also held a substantial ownership stake in Xceligent, a smaller but growing CRE information and listing competitor, and operated the largest and most

heavily trafficked CRE listings database, with 4.8 million registered members, over 6 million unique quarterly visitors, and listings covering roughly 27 million properties.

34. The FTC opposed the CoStar-LoopNet merger, concluding that "CoStar and LoopNet today are the largest national providers of CRE listings databases and information services both in terms of comprehensiveness of coverage and of geographic scope," that the transaction would increase "the likelihood that CoStar will exercise market power unilaterally," and that Xceligent was "a significant competitor to CoStar in the [metropolitan] areas where it is present, and the closest competitive alternative to CoStar for many U.S. CRE listings database and information services customers."

35. CoStar was permitted to complete the acquisition only after entering into a consent order issued on August 29, 2012. The consent order required CoStar to divest LoopNet's stake in Xceligent and imposed conduct restrictions, monitored by a third party, for a period of up to five years. Among other things, the consent order prohibited CoStar from directly or indirectly prohibiting or restricting customers from providing CRE listings or CRE information to CoStar competitors; required CoStar to allow customers to terminate their contracts and barred CoStar from manipulating contract terms or renewal cycles to impede competitors' ability to compete for customers; barred CoStar from suspending or terminating customers without consent or good cause; permitted customers threatened with intellectual-property litigation by CoStar to elect arbitration; prohibited CoStar from barring customers' use of competitors' software and services; and prohibited CoStar from retaliating against customers who subscribed to, invested in, or publicly endorsed a CoStar competitor.

36. The consent order's customer notices expressly informed CoStar's customers that CoStar "may not require you to subscribe to one of CoStar's products as a condition to subscribing to another CoStar product" and "may not require you to subscribe to products covering one or several geographic areas as a condition to subscribing to products covering other geographic areas." Most of the consent order's conduct provisions expired in August 2017, and the order expired by its terms on August 29, 2022. As alleged herein, CoStar has since engaged in nearly every category of conduct that the FTC expressly prohibited precisely because such conduct risked harm to competition.

37. CoStar did not take its commitments to the FTC seriously, even from the outset. According to Xceligent's former CEO, while the CoStar-LoopNet merger was still undergoing FTC review, CoStar told Xceligent customers it was going to buy Xceligent, shut it down, and increase prices, coercing customers to subscribe to CoStar immediately to avoid paying higher rates after the merger closed.

38. With the five years of protection provided by the FTC consent order, Xceligent expanded its coverage to around 50 metropolitan areas and its workforce to over 1,300 by 2016, and in 2016 launched business development efforts in the New York tri-state region — CoStar's most lucrative market.

39. As the consent order's conduct restrictions expired, CoStar moved against Xceligent through aggressive litigation premised on intellectual-property and technological-blocking theories. In December 2016, CoStar sued Xceligent for copyright infringement in federal court in Missouri, asserting claims that were premised in significant part on the conduct of two independent data-processing contractors. One contractor signed a stipulation that

Xceligent had directed it to copy content from CoStar websites, but later admitted it had been coerced into signing because it lacked the money to fight CoStar in court. CoStar also waged an aggressive public-relations campaign against Xceligent — including sending brokers across the country brochures pairing Xceligent's alleged copyright violations with unrelated news of impropriety by a Philippines-based contractor, and issuing a statement condemning Xceligent's "perverted philosophy" — to intimidate potential clients and damage Xceligent's reputation.

40. In June 2017, Xceligent filed antitrust counterclaims accusing CoStar of an anticompetitive scheme — including exclusionary contract terms, contamination of broker listings with artificial data, and technological impediments such as IP blocking — deployed in violation of the FTC's consent order. Before any court could reach those counterclaims, Xceligent filed for bankruptcy in December 2017 and ceased operations. Contemporaneous with CoStar's settlement with the Xceligent bankruptcy estate, Xceligent's antitrust counterclaims were released — ensuring that CoStar's conduct was never adjudicated on the merits.

41. Seven months after Xceligent's bankruptcy filing, CoStar raised the average price it charged new customers by 80%, from $255 to $466 per month.

42. CoStar's own public statements reflect its unchallenged position in the markets it dominates. On CoStar's Q3 2019 earnings call, its CEO told investors that CoStar is "all alone in a multi-trillion dollar asset class" and is "not being driven by an escalating tit for tat with a bunch of head-to-head competitors." On CoStar's Q2 2020 earnings call, he explained why CoStar's business was more resilient than during the 2008 recession: "in the great recession we had two super low cost competitors, so we're competing against a very well-funded Xceligent . . . charging probably 15%-20% of what we charge for a service . . . . We also were competing

against LoopNet at that time it was offering a product at 5% of the cost of our product. So those two things are no longer a factor." And in a 2025 earnings call, he boasted that CoStar's marketplaces and information solutions "can result in a $1 trillion addressable market with a deep moat."

### *C. CoStar's Anticompetitive Scheme*

#### *1. De Facto Exclusive Dealing Through Standard-Form Customer Terms*

43. CoStar imposes uniform, non-negotiable terms and conditions on all customers of the CoStar Platform and LoopNet (the "Customer Terms") that restrict customers' ability to share their own CRE listings, data, and photographs with any CoStar competitor. A customer who pays for CRE listing services through LoopNet executes a LoopNet Advertising Agreement, which incorporates by reference the LoopNet Advertising Agreement Terms and Conditions and the LoopNet Terms of Use; a customer who pays for CRE information services through the CoStar Platform executes a CoStar License Agreement, which incorporates by reference the CoStar License Agreement Terms and Conditions and the CoStar Terms of Use. These terms apply across CoStar's entire customer base and, on information and belief, have remained substantively identical in relevant part since at least 2017.

44. The Customer Terms are structured to deceive. They lull customers with the promise that the customer grants CoStar and LoopNet only a "non-exclusive license" in the "real estate information . . . provided by Customer," and they recite that "if Customer provides LoopNet [or CoStar] with any information or imagery, Customer retains its rights to such information and imagery." But other provisions render the promised non-exclusivity illusory.

45. The Customer Terms grant CoStar an “irrevocable” right to “modify,” adapt, display, distribute, and preserve customer-submitted content. Prior to 2020, the Customer Terms expressly disclosed that this license included the right to “add digital watermarks to certain parts of your property listing, including photographs.” On information and belief, approximately two weeks after CREXi (defined below) filed antitrust counterclaims identifying that watermark provision as an improper assertion of ownership over customer content, CoStar removed the disclosure from the Customer Terms — while continuing to watermark customer-submitted photographs.

46. The Customer Terms broadly define the “Licensed Product” to include not only CoStar’s own proprietary data but also any information, photographs, and listings that a customer itself submits to CoStar or LoopNet. Once customer-submitted content is integrated into the platforms, the Customer Terms provide that the product “is comprised of data that is owned by LoopNet [or CoStar] and its licensors,” which “shall retain exclusive ownership of all proprietary rights” therein. The Customer Terms then provide that a customer “shall not distribute, disclose, copy, reproduce, make available . . . or provide access to” any portion of the Licensed Product; shall not “upload, post or otherwise transmit any portion of the Licensed Product on, or provide access to any portion of the Licensed Product through, the Internet, any bulletin board system, any electronic network, any listing service or any other data sharing arrangement”; and may not “access or use the Licensed Product” if the customer is a “direct or indirect competitor of CoStar,” nor provide any portion of the Licensed Product to any such competitor. The Customer Terms further state that “under no circumstances” can any “photographs from the Licensed Product that depict properties that Licensee owns, controls,

represents or holds exclusives . . . be posted on any website that may compete with the Licensed Product."

47. The Customer Terms also require customers to acknowledge that the product constitutes CoStar's "valuable property and confidential and copyrighted information," to agree not to "challenge" CoStar's ownership of or rights in that information, and to "assign [CoStar or LoopNet] the right to pursue enforcement of copyright and other intellectual property claims against third parties" that copy or distribute the customer's submitted content. Separate provisions prohibit customers from providing "a hyperlink . . . to any Listings" in "any website or application of a competitor" — foreclosing even the simple act of directing a competitor to the customer's own listing.

48. Although the Customer Terms nominally represent that a customer retains rights to the content it submits, in practice a customer who lists a property on CoStar or LoopNet cannot share that same listing, data, or photographs with a competing platform without breaching the Customer Terms as CoStar construes them. If a customer does not agree to the Customer Terms, the customer cannot access CoStar's or LoopNet's CRE listing or information services at all.

49. Because CoStar's platforms are, for practical purposes, indispensable to CRE brokers and property owners who must reach the broadest possible audience of prospective buyers and tenants, customers — including Plaintiff — have no meaningful choice but to accept the Customer Terms in order to obtain CRE listing services.

50. The practical exclusionary effect of the Customer Terms is confirmed by brokers' own statements. When approached by CREXi about posting their listings on a competing

platform, brokers consistently declined, citing their contractual obligations to CoStar. One broker explained that she could not allow CREXi to post her listings because "that would be some sort of breach of contract with [CoStar]." Another explained that he could not work with CREXi because it would "conflict with our National CoStar agreement." A third told CREXi that listing his properties on multiple services would be "problematic in regard to [his] contractual relationship with CoStar." And a broker who relied on LoopLink as the sole repository of her listings explained: "Unfortunately our listings are on the [brokerage] website via Looplink. I do not keep lists of our listings on excel or other platforms as we have over 300 listings that change daily, and I don't have the extra time to keep track on multiple platforms. I can't think of an alternative way to get you [my brokerage]'s listings at this time."

51. The exclusionary effects of the Customer Terms are compounded by their long-term, auto-renewing structure. Most CoStar and LoopNet agreements have one- to three-year terms and renew automatically unless the customer provides lengthy advance notice — typically at least 60 days — to avoid renewal. Customers who miss the cancellation window are locked into another full term at then-current rates. Customers routinely complain about these practices: one reported that CoStar "auto-renew[ed] me for Year 2 at a new annual rate of $6,500+. The timing of their invoice's artfully crafted arrival fell just beyond the close of my cancellation window"; others reported that CoStar failed to timely notify them of the 60 day cancellation rule.

52. CoStar's pricing structure further locks in customers. CoStar charges brokerage customers based on the total number of brokers and agents at the brokerage, not the number who actually use the service. CoStar also demands that customers provide additional listing data beyond what they initially submit, without compensation.

53. These exclusive dealing arrangements foreclose competition in a substantial share of the CRE listing and information services markets, because they prevent any competitor from obtaining the customer-submitted data and listings a competing platform would need to attract users and challenge CoStar's dominance.

***2. Watermarking and "Fingerprinting" of Customer Content***

54. CoStar reinforces the exclusivity imposed by the Customer Terms by manipulating the content that customers submit to the CoStar Platform and LoopNet. CoStar routinely affixes its own watermark to photographs uploaded by customers, including photographs the customer itself took or privately commissioned and over which CoStar holds no copyright.

55. By watermarking customer-submitted photographs, CoStar creates the false impression, both to the submitting customer and to any rival platform, that the content belongs to CoStar rather than to the customer who created it. This deters customers from reusing or sharing their own photographs with competing platforms for fear of a copyright or contractual claim by CoStar, and it gives CoStar a mechanism to detect when a customer's content appears on a rival platform.

56. CoStar also unilaterally alters, or "fingerprints," the property data that customers submit, embedding deliberately inaccurate information — such as a property's parking ratio, lot size, or year built — into listing records, a practice CoStar itself calls "seeding" or "salting" listings. CoStar has acknowledged in prior litigation that its databases contain such deliberately altered "seed" data, and in its own complaint against Xceligent, CoStar described relying on "data that cannot be derived by independent research" — that is, data CoStar itself fabricated —

to detect copying. CoStar uses software to detect the appearance of its altered data on a competing platform and treats the appearance of that data elsewhere as evidence of a contractual or intellectual-property violation, which further deters customers from working with CoStar's competitors.

57. CoStar's own employees have confirmed that the company's database contains widespread inaccuracies, with one stating bluntly: "Data is fake, quotas are enforced so hard people make things up to keep their jobs."

58. By altering brokers' own data without their knowledge, CoStar creates a trap. Brokers often pull their own data from CoStar's platform, intending to use information they previously contributed for marketing outside of CoStar. Because CoStar has covertly altered that data, brokers inadvertently supply inaccurate information to CoStar's competitors — and are then "caught" by CoStar's detection software and threatened with copyright or contractual claims. The result is that brokers avoid competitors altogether out of fear and confusion.

59. CoStar's fingerprinting also directly harms its own customers, who are caused to rely on deliberately falsified data when valuing properties or creating marketing materials, or who must independently re-verify information they themselves originally entered but that CoStar has surreptitiously manipulated. In seeking to prevent competition, CoStar thus deliberately degrades its own product.

60. These watermarking and fingerprinting practices serve no legitimate business purpose independent of reinforcing CoStar's exclusive control over customer-submitted content, and they compound the anticompetitive effect of the Customer Terms described above.

### *3. Technological Barriers to Competitor Access*

61. In addition to its contractual and technical manipulation of customer content, CoStar deploys technological barriers designed to prevent competitors — and, in some instances, brokers themselves — from accessing publicly available CRE listing data, even where the broker who owns the data has authorized a competitor to access it.

62. These barriers include IP-address blocking, sometimes described by CoStar as an "abuse monitor," as well as firewalls and automated detection systems that block competitors' access to the CoStar Platform and LoopNet, including LoopNet's publicly accessible listing pages. As CoStar itself described the system in its complaint against Xceligent: "[i]f a single IP address views an excessive number of listings on the LoopNet website, consistent with access by a competitor or other user that is systematically copying listings, that IP address is temporarily blocked from accessing LoopNet." CoStar also employs firewalls to permanently block IP addresses associated with competitors.

63. CoStar deploys this blocking technology on brokers' own LoopLink-hosted websites without informing the brokers. As a result, brokers grant CoStar's competitors permission to access the brokers' own listings on the brokers' own publicly available websites, only for the competitor to be denied access. Brokers have expressed surprise and frustration at this practice; one broker told CREXi: "I'm not sure why you can't access these [listings] because they are on our own website."

64. Thus, CoStar now employs the very blocking technology that it condemned — under oath — when LoopNet deployed it against CoStar before the 2012 acquisition.

65. Blocking harms brokers directly, because they must resort to far more time-consuming manual processes to maintain and update their CRE listings across multiple platforms.

66. Together with the exclusive dealing Customer Terms and the watermarking and fingerprinting practices described above, these technological barriers ensure that the data necessary to build a competing CRE listing or information platform remains within CoStar's exclusive control, foreclosing the emergence of any viable competitor.

***4. Enforcement Through Penalties, Threats, Scraping, Filters, and Litigation***

67. CoStar enforces the exclusivity created by the Customer Terms and its content-manipulation practices through an array of coercive mechanisms directed at both customers and competitors.

68. First, the Customer Terms impose harsh penalties on customers who violate the restraints described above, including termination of the customer's agreements, suspension or blocking of the customer's access to the CoStar and LoopNet platforms, acceleration of all remaining subscription fees, and exposure to damages, injunctive relief, and attorneys' fees. These penalties have teeth: CoStar and LoopNet subscriptions are expensive, acceleration can render a brokerage liable for tens or hundreds of thousands of dollars at once, and CoStar's reputation for litigation makes the threat of suit credible.

69. Second, on information and belief CoStar sends threatening communications to customers suspected of sharing their own content with competitors.

70. Third, CoStar scrapes competitors' websites in search of customer cross-listings. For example, before suing CREXi CoStar scraped CREXi's website both for competitive intelligence and to identify CoStar-watermarked photographs it could use as the basis for copyright claims — including photographs that the submitting brokers, not CoStar, owned.

71. Fourth, CoStar demands that competitors adopt technological image "filters" to detect and remove photographs matching CoStar-watermarked images. CREXi implemented such a filter and notified brokers that their own photographs would be removed from CREXi's platform, all at CoStar's behest.

72. Fifth, CoStar wields litigation itself as an anticompetitive weapon. Since the 1990s, CoStar has filed more than 40 federal copyright-related lawsuits against individuals, its own customers, and competitors, large and small — far more than comparably situated data companies. As The Real Deal, a widely read CRE publication, put it, CoStar "uses a playbook of aggressive lawsuits and public-relations warfare against its rivals," whose "tactics can push them to the brink of collapse or weaken them enough to make soft targets for an acquisition." A former CBRE executive similarly observed that CoStar "used litigation to suppress innovation in the space" and that "over time, they have cultivated an adversarial approach to customers."

73. In 2014, CoStar sued four users of CompStak, a crowdsourced CRE data startup, alleging they had submitted CoStar data to CompStak. CompStak responded that the data did not come from or belong to CoStar, and that the suit was "an attempt to intimidate and discourage" brokers from "using databases that compete with CoStar" in violation of the FTC's consent order; CoStar dropped the suit two months later. CompStak's CEO said there was "no doubt in

[his] mind" that CoStar launched the suit to intimidate him: "It was all about scare tactics. . . . The point was not about copyright. The point was trying to smear CompStak in the press."

74. In 2015, CoStar brought similar copyright infringement claims against another competitor, RealMassive, claiming the company accepted and used broker-submitted CRE photographs that belonged to CoStar. RealMassive disputed the claim, but its users — fearing they would be targeted as CompStak's users had been — began abandoning the platform, and RealMassive quickly settled. A former RealMassive executive stated that CoStar's broker intimidation tactics "absolutely worked."

75. CoStar's litigation campaign continues. In July 2025, CoStar sued Zillow Group, Inc. for copyright infringement, accusing Zillow of hosting nearly 47,000 of CoStar's purportedly copyrighted images and of "free-riding" on CoStar's content — allegations following the same playbook as CoStar's suits against LoopNet, Xceligent, and CREXi. Zillow has denied the claims and observed that the lawsuit reflects a broader pattern of CoStar leveraging litigation rather than competing on product quality or customer service.

76. On information and belief, the purpose and effect of CoStar's enforcement campaign is to instill fear in broker-customers, who rely on CoStar for their livelihoods, so that they will not risk working with rivals offering better prices or products. CoStar's watermarking and fingerprinting practices compound this effect by making it easier for CoStar to detect and punish customers who share their own content with rival platforms.

***D. Prior Antitrust Scrutiny of CoStar's Conduct***

77. CoStar's exclusionary conduct has previously drawn antitrust scrutiny. Commercial Real Estate Exchange, Inc. ("CREXi"), a CRE listing and information services

competitor founded in 2015, asserted antitrust counterclaims against CoStar in litigation pending in the United States District Court for the Central District of California, CoStar Group, Inc. v. Commercial Real Estate Exchange, Inc., No. 2:20-cv-08819 (C.D. Cal.), alleging that CoStar's exclusive dealing contracts and technological barriers unlawfully maintained CoStar's monopoly power.

78. Although the district court dismissed CREXi's amended antitrust counterclaims with prejudice, the United States Court of Appeals for the Ninth Circuit reversed and reinstated those counterclaims, holding that CREXi had plausibly alleged that CoStar's contractual provisions "lock brokers into exclusive agreements with CoStar" and that CoStar engaged in anticompetitive conduct through de facto exclusive dealing and technological barriers that "protect[] its monopoly in a manner not attributable to competition on the merits." CoStar Grp., Inc. v. Com. Real Est. Exch., Inc., 141 F.4th 1075 (9th Cir.), opinion amended and superseded on denial of reh'g, 150 F.4th 1056, 1074–75 (9th Cir. 2025), cert. denied, 2026 WL 795193 (U.S. Mar. 23, 2026). The Supreme Court denied CoStar's petition for certiorari, and the CREXi litigation is ongoing.

79. The conduct at issue in the CREXi litigation is substantially the same conduct alleged in this Complaint, applied to CoStar's own paying customers, including Plaintiff, rather than to a competing platform. Substantially similar antitrust counterclaims brought by Xceligent were released in bankruptcy before any adjudication on the merits, and the FTC's 2012 consent order — nearly every prohibition of which CoStar has since violated, on information and belief — provides a regulatory benchmark identifying the conduct alleged herein as anticompetitive.

### *E. CoStar's Effort to Insulate Its Conduct Through a Buried Class-Action Waiver*

80. In October 2024, the Ninth Circuit held oral argument on CREXi's appeal and signaled a willingness to hold that CREXi had adequately alleged antitrust claims against CoStar. On information and belief, CoStar responded by quickly revising the Customer Terms to insert, for the first time, a provision stating: "EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO PARTICIPATE IN A CLASS OR COLLECTIVE ACTION AGAINST THE OTHER PARTY IN ANY DISPUTE OR PROCEEDING (WHETHER BASED ON CONTRACT, STATUTE, TORT, OR ANY OTHER THEORY)." This purported class waiver appeared for the first time in the LoopNet Advertising Agreement Terms and Conditions and the CoStar License Agreement Terms and Conditions on or about February 6, 2025, and in the LoopNet and CoStar Terms of Use in May 2025.

81. By their own terms, the current LoopNet and CoStar terms direct subscribers who executed their agreements before February 6, 2025 to prior versions of the terms — none of which contains a class waiver — and provide that a customer's separately executed Advertising Agreement or License Agreement controls over any inconsistent Terms of Use. Customers who, like Plaintiff, subscribed before February 2025 are accordingly not subject to the purported class waiver.

82. Nor did CoStar provide customers with notice of, or obtain assent to, the new waiver. The Terms of Use state that CoStar may change them "at any time by posting revised terms on the Product" and that "[i]t is your responsibility to check periodically for any changes" — an express disclaimer of any obligation to notify customers, with the revised terms accessible only through small-font hyperlinks at the bottom of CoStar's and LoopNet's webpages. And

because CoStar's agreements renew automatically unless cancelled at least 60 days in advance, customers' agreements have been renewed with the new waiver without notice or assent.

83. The Customer Terms are contracts of adhesion: a customer cannot opt out of the class waiver without abandoning the CoStar and LoopNet platforms altogether — which, given CoStar's dominance and the absence of viable alternatives caused by the very scheme alleged herein, is no meaningful choice at all.

***F. CoStar's Supracompetitive Prices, Forced Bundling, and Degraded Quality***

84. CoStar's pattern is consistent: each time it eliminates a competitor, it raises prices. Shortly after acquiring LoopNet in 2012, CoStar raised listing prices for some brokers by 300% to 500%.

85. Until 2017, LoopNet offered lower-priced information products that competed with the CoStar Platform, including Premium Searcher, Property Facts, and Property Comps, which brokers could purchase in any combination. In October 2017, CoStar eliminated all three products, forcing brokers seeking similar data onto the higher-priced CoStar Platform.

86. CoStar simultaneously made LoopNet listing services more expensive. It discontinued LoopNet's unlimited listing plans — which had allowed brokerage firms to post large numbers of listings for a few dollars each — and replaced them with tiered advertising plans (Silver, Gold, Platinum, and Diamond) at higher price points. CoStar capped the number of advertisements available in each tier, pressuring brokers to upgrade to costlier tiers to maintain comparable visibility, with limited "sold-out" Diamond slots creating artificial scarcity.

87. In 2018, after eliminating Xceligent, CoStar undertook a campaign to ensure what it called "strong and consistent pricing integrity," eliminating discount programs and raising the average price per new broker user license by 80%, from $255 to $466 per month. Around 2019, CoStar began imposing annual price increases of approximately 6–7% on the CoStar Platform — roughly double its historical 3% annual increases — with its CEO explaining that CoStar identifies "underpriced accounts" and "brings them up." In 2021, CoStar's CFO announced that the company was "going to begin normal price escalations on CoStar Suite" because renewal rates had moved from 94.5% "up over 97%."

88. After pausing annual increases during the early COVID-19 pandemic, CoStar reinstituted them beginning in September 2021. Effective July 1, 2021, CoStar also eliminated the local, regional, state, and national options that CoStar had offered for 30 years. This forced bundling abandoned both CoStar's own longstanding product structure and the protections specifically imposed by the FTC's consent order.

89. Throughout the Class Period, CoStar has continued to impose annual price increases on CoStar Platform subscribers, compounding already-supracompetitive prices.

90. CoStar's revenue growth throughout the Class Period has been sustained, in substantial part, by these price increases imposed on a captive customer base. As a result, in 2025 CoStar earned approximately $1.259 billion from the CoStar Platform and $312 million from LoopNet — together roughly 49% of company revenue — at gross margins exceeding 34%. CoStar has repeatedly described its products as "mission critical" to its customers — an acknowledgment that CRE professionals have no viable alternative — and has reported contract renewal rates of around 90% or more in every quarter throughout the Class Period.

91. CoStar has sustained these prices despite the availability of dramatically cheaper rivals. On information and belief, CoStar's CRE listing and information services cost approximately 40% more than CREXi's and Xceligent's comparable services (before CoStar drove Xceligent from the market). CoStar's ability to charge significantly more than its competitors' prices without losing meaningful business is direct evidence of its monopoly power.

92. Even as prices have risen, quality has declined. Customers report significant usability issues, widespread technical glitches, and unresponsive support: one customer described CoStar's customer service as "atrocious," stating, "They overpromise, underdeliver." On information and belief, as CoStar has eliminated virtually all competition, it has invested less in its research operations, and the quality of its data has declined while prices continue to increase — a dynamic compounded by CoStar's deliberate seeding of false data into its own product.

93. CoStar charges all customers based on the same rate card — a uniform pricing structure applied across its customer base. Because all Class members are subject to the same pricing methodology, the overcharge resulting from CoStar's anticompetitive conduct can be measured on a classwide basis.

## V. RELEVANT MARKETS

94. The relevant product markets are: (a) the nationwide market for Internet CRE listing services; and (b) the nationwide market for Internet CRE information services (together, the "Relevant Markets"). The FTC recognized these as distinct relevant lines of commerce in connection with CoStar's acquisition of LoopNet, identifying "(a) CRE listings databases; and (b) CRE information services" as relevant product markets.

95. Internet CRE listing services and Internet CRE information services are each distinct products with no reasonably interchangeable substitutes. Potential alternatives — such as CRE listings published in print media, on individual broker websites, or on general-purpose platforms such as Google or Facebook Marketplace — lack targeted CRE audiences, sufficient listing density, and centralized searchability, and are neither functional nor economic substitutes. A small but significant, non-transitory increase in the price of either service would not cause a sufficient number of customers to switch to another product to make such a price increase unprofitable. Indeed, CoStar has implemented repeated, significant price increases in both Relevant Markets over the past eight years while steadily increasing subscriber volume and maintaining renewal rates around 90% or more.

96. CRE listing services and CRE information services are complementary but distinct: a critical mass of listings is a necessary input for generating high-quality market analytics, and market power in listing services bolsters market power in information services by depriving rivals of necessary data. Yet customers can and do buy one service without the other, and CoStar charges separately for each. CoStar's ability to charge supracompetitive prices in both markets confirms that neither constrains the other and that both are relevant product markets.

97. The relevant geographic market for each Relevant Market is the United States, because CoStar markets, sells, and provides both CRE listing services and CRE information services on a nationwide basis, and customers throughout the United States purchase these services from CoStar under substantially uniform, nationwide terms. Although CoStar and its competitors historically offered subscriptions by metropolitan area, since approximately 2021

CoStar has offered its services exclusively on a nationwide basis, and its chief remaining competitor likewise offers only national subscriptions.

## VI. COSTAR'S MONOPOLY POWER

98. CoStar possesses monopoly power in each of the Relevant Markets. On information and belief, CoStar controls approximately 80% or more of the nationwide Internet CRE listing services market and the nationwide Internet CRE information services market, with some industry estimates placing its share of each market at or above 90%. LoopNet alone accounts for approximately 70% of all online CRE listing traffic and receives many times the monthly visitors to its next largest competitor, CREXi.

99. CoStar's own statements confirm its dominance. CoStar boasts that "nearly 90% of all CRE activity occurs on a CoStar Network"; that in 2024 alone roughly $400 billion in CRE transactions involved LoopNet searches; that LoopNet drives many multiples more activity than its nearest competitor; and that LoopNet is "the world's biggest and busiest commercial real estate marketplace."

100. CoStar's monopoly power is protected by substantial barriers to entry, including the network effects described above, the substantial time and expense required to assemble a comprehensive nationwide database of CRE listings and information, high customer switching costs — which industry analysts have described as a "switching cost moat" — and the exclusionary scheme described in this Complaint.

101. There is also direct evidence of CoStar's monopoly power: as alleged above, CoStar has repeatedly and substantially raised prices without meaningful customer defections, while maintaining renewal rates of around 90% or more. The marginal cost of providing another

user access to the CoStar Platform or LoopNet is near zero, yet CoStar charges thousands of dollars per user per year.

102. CoStar has exercised its monopoly power to charge supracompetitive prices — on information and belief, substantially more than the prices charged by CoStar's smaller competitors for comparable services — and to impose one-sided, non-negotiable contractual terms on its customers.

## VII. ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

103. Defendants' anticompetitive scheme has caused, and continues to cause, substantial harm to competition and to Plaintiff and the Class, including: (a) supracompetitive prices for CRE listing and information services; (b) reduced choice among providers of those services; (c) reduced innovation and quality of service; and (d) the exclusion of actual and potential competitors from the Relevant Markets.

104. On information and belief, CoStar's conduct has foreclosed competitors from access to well over 40% of the inputs necessary to make a competing CRE listing or information service viable. In markets characterized by strong network effects and high data-collection costs, that foreclosure has denied every actual and potential rival the scale required to compete, raised rivals' costs, and prevented the emergence of any competitor capable of imposing price discipline on CoStar.

105. CoStar's scheme also injures its customers directly by denying them the ability to market their listings across multiple platforms. CRE brokers owe fiduciary duties to their clients to market listings as widely as appropriate. By preventing brokers from sharing their own

listings, data, and photographs with competing platforms, CoStar frustrates the this duty and deprives customers of broader, cheaper, and more accurate marketing channels.

106. Plaintiff has paid CoStar Realty Information, Inc., doing business as LoopNet, monthly fees ranging from approximately $178.00 to $356.00 for a "Premium Listing Plan," continuously since at least September 2024. Those fees are supracompetitive and would not have been charged, or would have been substantially lower, in a market unconstrained by Defendants' anticompetitive conduct.

107. CoStar's anticompetitive scheme — including its exclusive dealing arrangements, its manipulation of customer-supplied content, and its technological barriers — has remained in full effect throughout the Class Period and continues to the present. Each supracompetitive payment made by Plaintiff and Class members during the Class Period constitutes a new and independent injury caused by CoStar's ongoing anticompetitive conduct.

108. Plaintiff's and the Class's injuries are of the type the antitrust laws were designed to prevent and flow directly from that which makes Defendants' conduct unlawful.

109. Defendants cannot identify any procompetitive justification for the conduct described in this Complaint that outweighs its harm to competition. CoStar's contractual restrictions do not protect legitimate intellectual-property interests: the vast majority of the listings, photographs, and data CoStar claims as proprietary were supplied by CoStar's own customers, and blocking customers from distributing their own content serves no purpose other than to deny rivals the inputs they need to compete. CoStar's prior conduct confirms the point — before acquiring LoopNet, CoStar argued that public CRE listings should be freely accessible to competitors, litigated to protect that principle, and adopted internal policies reflecting it,

reversing course only once it possessed the market power to exclude rivals. To the extent any procompetitive justification exists, it could be achieved through means significantly less restrictive of competition than the conduct alleged herein.

## VIII. CLASS ACTION ALLEGATIONS

110. Plaintiff brings this action on behalf of himself and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as a representative of the following proposed Class:

> All persons and entities in the United States that paid CoStar Group, Inc. or CoStar Realty Information, Inc. (including for services marketed under the LoopNet brand) for Internet CRE listing services or Internet CRE information services at any time from April 14, 2022, through the date Defendants' unlawful conduct and its anticompetitive effects cease (the "Class Period").

111. Excluded from the Class are: Defendants; Defendants' parents, subsidiaries, affiliates, officers, directors, and employees; any co-conspirators; the judge presiding over this action and members of the judge's immediate family; and any governmental entities.

112. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable. On information and belief, tens of thousands of persons and entities throughout the United States paid CoStar or LoopNet for CRE listing or information services during the Class Period.

113. Commonality. Common questions of law and fact exist as to all members of the Class, including, among others: (a) whether Defendants engaged in the anticompetitive conduct alleged herein; (b) whether that conduct unreasonably restrained trade or unlawfully maintained monopoly power in violation of Sections 1 and 2 of the Sherman Act; (c) whether Defendants'

conduct caused antitrust injury to Plaintiff and the Class; and (d) the appropriate measure of classwide damages and injunctive relief.

114. Typicality. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all other Class members, paid Defendants directly for CRE listing services subject to the same uniform Customer Terms and the same nationwide pricing and conduct alleged herein.

115. Adequacy. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class, and Plaintiff has retained counsel experienced in complex antitrust class action litigation.

116. Predominance and Superiority. Common questions predominate over any individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, given the impracticability of individual litigation by Class members whose individual damages, considered alone, may be small relative to the cost of individual litigation.

## IX. CAUSES OF ACTION

## COUNT ONE

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

(De Facto Exclusive Dealing Through Standard-Form Customer Terms)

117. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

118. Through the Customer Terms described above, CoStar has entered into de facto exclusive dealing arrangements with substantially all of its CRE listing and information services customers, including Plaintiff, that in practice restrain those customers from sharing their own CRE data, listings, and photographs with any CoStar competitor.

119. These exclusive dealing arrangements foreclose competition in a substantial share of the Relevant Markets, in which CoStar possesses monopoly power, and unreasonably restrain trade.

120. These arrangements affect a substantial volume of interstate commerce and lack any procompetitive justification sufficient to outweigh their anticompetitive effects; to the extent any such justification exists, it could be achieved through significantly less restrictive means.

121. As a direct, material, and proximate result of these exclusive dealing arrangements, Plaintiff and the Class have suffered injury to their business and property, including the payment of supracompetitive prices for CRE listing and information services, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

122. Plaintiff and the Class are entitled to treble damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs, pursuant to Section 4 of the Clayton Act, and to permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT TWO

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

(Unlawful Monopolization of the Internet CRE Listing and Information Services Markets)

123. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

124. CoStar possesses monopoly power in each of the Relevant Markets, as alleged above.

125. CoStar has willfully acquired and unlawfully maintained that monopoly power, not through competition on the merits, but through the actions described in this Complaint, including its watermarking and fingerprinting of customer-submitted content, its technological barriers to competitor access, and its enforcement of the scheme through penalties, threats, scraping, filters, and litigation.

126. Although each component of this scheme is independently anticompetitive, together they have a cumulative, synergistic effect that has entrenched CoStar's monopoly power and prevented the emergence of any viable competitor in the Relevant Markets.

127. CoStar's conduct affects a substantial volume of interstate commerce and lacks any procompetitive justification sufficient to outweigh its harm to competition.

128. As a direct, material, and proximate result of CoStar's unlawful monopolization, Plaintiff and the Class have suffered injury to their business and property, including the payment of supracompetitive prices for CRE listing and information services, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

129. Plaintiff and the Class are entitled to treble damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs, pursuant to Section 4 of the Clayton Act, and to permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT THREE**

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

(Attempted Monopolization of the Internet CRE Listing and Information Services Markets, Pled in the Alternative to Count Three)

130. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

131. This Count is pled in the alternative to Count Two, to the extent CoStar is found not to possess monopoly power in one or both of the Relevant Markets.

132. CoStar has engaged in the exclusionary conduct described in this Complaint with the specific intent to acquire or maintain monopoly power in the Relevant Markets, and there is a dangerous probability that CoStar will succeed, or has succeeded, in achieving that monopoly power.

133. CoStar's conduct affects a substantial volume of interstate commerce and lacks any procompetitive justification sufficient to outweigh its harm to competition.

134. As a direct, material, and proximate result of CoStar's attempted monopolization, Plaintiff and the Class have suffered injury to their business and property, including the payment of supracompetitive prices for CRE listing and information services, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

135. Plaintiff and the Class are entitled to treble damages, pre- and post-judgment interest, reasonable attorneys' fees, and costs, pursuant to Section 4 of the Clayton Act, and to permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that this Court:

A. Determine that this action may be maintained as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

B. Adjudge and decree that Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, as alleged herein;

C. Permanently enjoin Defendants, their officers, directors, agents, employees, subsidiaries, affiliates, successors, and assigns from continuing, maintaining, renewing, or enforcing the unlawful conduct alleged herein, and order such further equitable relief as necessary to restore competition in the Relevant Markets;

D. Award Plaintiff and the Class damages sustained by reason of Defendants' unlawful conduct, trebled as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15, together with pre- and post-judgment interest;

E. Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15; and

F. Award such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: August 20, 2026

Respectfully submitted,

*/s/ Steven T. Webster*
Steven T. Webster (VSB No. 31975)
Webster Book LLP
2300 Wilson Blvd., Suite 728
Arlington, VA 22201
(888) 987-9991 (telephone and fax)
swebster@websterbook.com
*Local Counsel for Plaintiff*

GLANCY PRONGAY WOLKE & ROTTER LLP

Brian D. Brooks (*Pro Hac Vice forthcoming*)
Lee Albert (*Pro Hac Vice forthcoming*)
745 5th Avenue, 5th Floor
New York, NY 10151
Tel: (212) 682-5340
bbrooks@glancylaw.com
lalbert@glancylaw.com